# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MASSACHUSETTS
# WESTERN DIVISION

|  |  |
|---|---|
| In re:<br><br>AUDREY EVE SCHATZ,<br><br>                Debtor | Chapter 7<br>Case No. 14-30835-EDK |
| AUDREY EVE SCHATZ,<br><br>                Plaintiff<br><br>v.<br><br>UNITED STATES DEPARTMENT OF EDUCATION, ACS LOAN SERVICING, INC., ACCESS GROUP, INC., and MASSACHUSETTS EDUCATIONAL FINANCING AUTHORITY,<br><br>                Defendants | Adversary Proceeding<br>No. 15-3001 |

## MEMORANDUM OF DECISION

I. PROCEDURAL HISTORY

On August 29, 2014, (the "Petition Date"), Audrey Eve Schatz, (the "Debtor"), filed a *pro se* voluntary petition under Chapter 7 of the United States Bankruptcy Code (the "Bankruptcy Code" or the "Code").[1] The Debtor's primary debts are student loans, incurred while attending law school in the early 2000s. Other than the student loans, the Debtor's only other debts on the

---

[1] *See* 11 U.S.C. § 101 *et seq.* All references to statutory sections are to the Bankruptcy Code unless otherwise specified.

1

Petition Date were a small credit card balance and a judgment for unpaid tuition owed to her daughter's private school secured by a judicial lien on the Debtor's residence. The Debtor successfully avoided that lien pursuant to § 522(f) and received a discharge of all dischargeable debts pursuant to § 727 on December 29, 2014.

On January 7, 2015, the Debtor commenced this adversary proceeding against the United States Department of Education (the "DOE"), Access Group, Inc. ("Access"), Massachusetts Educational Financing Authority ("MEFA"), and ACS Loan Servicing, Inc. seeking a discharge of the student loans. Soon thereafter, the Debtor hired counsel to represent her. ACS Loan Servicing, Inc. was voluntarily dismissed from the adversary proceeding, and the Debtor has since reached a stipulation with the DOE. The stipulation with the DOE provides that the Debtor will enter an income-based repayment plan for 5 years[2] (with monthly payments anticipated to be $0.00); the outstanding balance at the end of the repayment period will be deemed discharged through the bankruptcy case.

Despite participating in mediation, the Debtor was unable to reach agreements with the remaining defendants, Access and MEFA (together, the "Defendants"). At the time of trial in November 2017, the Debtor owed Access and MEFA approximately $82,000 and $28,000, respectively. The parties introduced numerous documents as exhibits, and the Debtor was the only witness to testify. At the conclusion of the 3-day trial and after submission of post-trial briefs, the Court took the matter under advisement.

---

[2] At trial, the Debtor indicated that she thought the repayment term was 6 years. The actual stipulation with the DOE specifies that the term is 60 months (5 years).

2

II.     FACTS AND POSITIONS OF THE PARTIES

The Debtor is 64 years old, single, and currently living alone in the home she owns in Great Barrington, Massachusetts. She has never been married. Her 19-year-old daughter lives in Boston, where she is a sophomore in college. In 1977, the Debtor received a B.A. in Psychology from the University of Massachusetts Amherst. She then relocated to Florida, but returned to Massachusetts in 1993. Following her undergraduate studies, the Debtor's employment history was varied and never very lucrative. She worked at a frozen food company, repaired used clothing, sold items at flea markets, and directed outreach for an organization that helped teenagers and their families. Immediately prior to attending law school, the Debtor held a part-time position at a local high school where her compensation never exceeded $20,000 annually (and, in fact, had been reduced to $12,000 during her last year in the position). In hopes of increasing her skills and earning potential to provide a better life for herself and her young daughter, the Debtor decided to go to law school. She used student loans to finance both her law school education and to help support herself and her daughter during her studies. The Debtor graduated from the Western New England College School of Law in 2009 and was admitted as an attorney in Massachusetts in 2010.

The Debtor claims that she undertook an extensive employment search after graduating from law school; however, her hopes for better-paying employment were not realized. According to the Debtor, she applied to over 75 jobs during the first year following graduation, but received only one response. After an interview, she was not offered the position. She fared no better the next year. She applied to approximately 25 jobs, but received no responses. In the meantime, the Debtor made ends meet by taking on odd jobs, such as housecleaning, gardening, and painting. In 2013, the Debtor decided to take a new approach, suspended her active job search, and concentrated on building a solo practice and continuing her involvement with the Berkshire Center

for Justice (the "Center").

The Center is a non-profit legal assistance organization in western Massachusetts that provides local residents with free and reduced-price legal services. Seeing the need for greater legal services for underserved populations in the Berkshires, the Debtor founded the Center while in law school, and she remains its Executive Director. Despite the fact that the Center is not always able to compensate her due to budget constraints, the Debtor has continued to work for the Center in both administrative and legal capacities. The Debtor testified that she continues her work there because she was advised by other professionals in the legal field that legal work, even if volunteer, is essential to improving future employment opportunities.

In 2016, the Debtor grossed $8,137.50 from her work for the Center, and reported $7,061.91 in gross income for January through August 2017. The Debtor's income from other solo practice remains on the low end, a fact the Debtor attributes to her lack of legal experience and problems caused by various medical conditions. In 2016, the Debtor generated $12,022.50 in gross income from solo practice, and $4,927.50 for January through August 2017. From time to time, the Debtor is compensated by a Boston law firm to assist with real estate closings in the Berkshires. In 2016, the Debtor received $1,300 in gross income from that work, and $380 for January through August 2017.

The Debtor also generates income by seasonally renting a room in her house through Airbnb (a short-term room rental website). In 2016, the Debtor grossed $3,382 from Airbnb rentals, and had generated $1,633 gross income for January through August 2017. The Debtor believes her Airbnb income has decreased significantly due to increased competition, as more people in the Berkshires are now listing rentals on the website.

In sum, since graduating from law school, the Debtor's gross annual income has ranged

between $21,000 and $25,000, with net income ranging between $10,000 and $15,000 annually. The Debtor estimated that her expected Social Security benefits at age 66 will be $856, although she expects to incur Medicare expenses which will offset a portion of that income. The Debtor maintains that there is essentially no prospect of a significant increase in her income through new employment, additional employment, or Social Security. However, she has acknowledged that her current income stream, although minimal, has obtained some level of stability.

The Debtor owns a 4-bedroom home, (the "Property"), which the Debtor has not had appraised and has not attempted to sell. On Schedule A filed with her petition in 2014, the Debtor listed its value as $165,000.[3] According to the Debtor, between 2009 and 2014, the Property suffered storm damage and is in need of substantial repairs, none of which she has been able to afford. On the Petition Date, the balance of the mortgage loan on the Property approximated $59,000, but the Debtor testified that she believed the outstanding balance at the time of trial was approximately $54,000. The current monthly mortgage payment is about $440 per month, and Debtor pays an additional $270 per month for real estate taxes.

The Debtor has few assets other than the equity in the Property. At the time of filing, she disclosed a checking account with a balance of $2,000, a savings account with a balance of $8,710, and an IRA with a balance of approximately $1,800. By the time of trial, the amount in the savings account had been reduced to approximately $3,300, largely due to payment of legal fees for representation in this adversary proceeding. The Debtor also owns an older-model vehicle, which is currently in need of mechanical repairs and body work estimated at $1,000, which the Debtor has not been able to afford.

---

[3] At trial, the Debtor testified that the value of the Property might be as low as $125,000, although she later admitted that that number could also represent her estimate of the *equity* in the Property. This discrepancy is more fully discussed later in this Memorandum.

The Debtor's relatively meager income has necessitated a rather austere lifestyle. She receives free health insurance through MassHealth, as well as fuel assistance and reduced electricity and telephone rates. She testified that in the colder months, she keeps the temperature in her home around 50 degrees in order to reduce fuel costs, a fact which renders her unable to rent the house through Airbnb during those months. The Court finds, based on the Debtor's testimony and the expenses listed on her amended Schedule J, that the Debtor lives a rather spartan lifestyle not susceptible to further reduction of necessary expenses.

Much of the Debtor's testimony focused on her physical health and the impact of several medical conditions on her ability to work. She testified that she has physical and cognitive impairments related to injuries sustained when she fell down her staircase in July 2013. According to the Debtor, the fall resulted in a brain injury that has caused decreased energy levels, difficulty with information processing, and problems with speech. Her testimony and the documentary evidence make clear that the Debtor has consulted with many medical professionals in an often-disappointing attempt to obtain treatment, but she also testified that she has recently located a cognitive therapist that has resulted in some improvement.

The Debtor further testified that she suffers from other medical difficulties including ocular migraines, Hashimoto's disease, kidney disease, a torn rotator cuff, generalized neck, hip, and head pain, chronic diarrhea, and a "wrinkle in her eye" that impairs her vision. With the exception of the torn rotator cuff, which requires surgery the Debtor says she cannot afford, the Debtor admitted that she is either taking medication as recommended by medical professionals to control her medical ailments, or is not currently being treated because no treatment is currently recommended.

As a result of these medical conditions, the Debtor insists that she is unable to sufficiently increase her working hours to generate the additional $1,000 per month that would be required to

make payments on her student loans. In fact, the Debtor argues, her current living condition is well below a minimal standard of living, and any modest increase in income would be necessary for her continued support as she ages. Accordingly, she maintains, payment of the student loans would cause an "undue hardship," and the loans should be discharged pursuant to § 523(a)(8).

The Defendants oppose the discharge of the student loans on three primary grounds. First, they argue that the Debtor has not made a reasonable effort to increase income through new or additional employment. They maintain that the Debtor is voluntarily underemployed in light of her decision to provide uncompensated services to the Center. They note that the Debtor is a well-educated, intelligent woman who, in spite of claimed poverty and medical conditions, has successfully raised a daughter as a single parent, owns a home, has kept current on other bills and expenses, and managed to found the Center while attending law school and raising her daughter. Accordingly, they argue, she has not maximized her skills to increase her earning potential.

Second, the Defendants argue, the Debtor failed to provide credible evidence demonstrating that her medical conditions prevent her from gaining more lucrative employment. The Debtor did not call a medical doctor to testify as to her current condition and long-term prognosis and, the Defendants say, the documentary evidence does not support the conclusion that the Debtor is medically impaired to the extent claimed in her papers and at trial.

Finally, the Defendants argue, the equity in the Debtor's Property is more than sufficient to pay the student loans in full. Accordingly, excepting the student loans from discharge and requiring payment will not impose an undue hardship on the Debtor within the meaning of § 523(a)(8).

III. DISCUSSION

Student loan debts are generally excepted from a debtor's bankruptcy discharge "unless excepting such debt from discharge . . . would impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8). The debtor bears the burden of proving such undue hardship by a preponderance of the evidence. *Lorenz v. Am. Educ. Servs./Pennsylvania Educ. Assistance Agency (In re Lorenz)*, 337 B.R. 423, 430 (B.A.P. 1st Cir. 2006).[4] "Undue hardship" is not defined in the Bankruptcy Code, and courts have developed two major analytical frameworks to guide the determination of whether a debtor has established the requisite hardship. A majority of circuit courts have adopted the analysis set forth by the Second Circuit in *Brunner v. New York State Higher Educ. Servs. Corp. (In re Brunner)*, 831 F.2d 395 (2d Cir. 1987), which requires the Debtor to prove:

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Brunner*, 831 F.2d at 396; *see Stevenson v. Educ. Credit Mgmt. Corp. (In re Stevenson)*, 463 B.R. 586, 594 (Bankr. D. Mass. 2011) (collecting circuit-level cases), *aff'd* 475 B.R. 286 (D. Mass. 2012).

The First Circuit has not adopted a specific test to determine whether undue hardship has been established, *see Nash v. Conn. Student Loan Found. (In re Nash)*, 446 F.3d 188, 190-91 (1st Cir. 2006), but the vast majority of former and currently-sitting bankruptcy judges in

---

[4] Technically, the initial burden is on the creditor to "demonstrat[e] that the debt exists and that the debt is of the type excepted from discharge under § 523." *Lorenz*, 337 B.R. at 430 (citing *Western Auto Supply Co. v. Savage Arms, Inc. (In re Savage Indus., Inc.)*, 43 F.3d 714, 838-39 (1st Cir. 1994)). Here, there is no dispute that the student loans in question exist and are the types of debts contemplated by § 523.

8

Massachusetts, as well as the Bankruptcy Appellate Panel for the First Circuit (the "BAP"), have opted to take the minority approach and apply the "totality of the circumstances" test.[5] As the BAP has explained:

> [t]he "totality of the circumstances" analysis requires a debtor to prove by a preponderance of the evidence that (1) his past, present and reasonably reliable future financial resources; (2) his and his dependents' reasonably necessary living expenses; and (3) other relevant facts or circumstances unique to the case, prevent him from paying the student loans in question while still maintaining a minimal standard of living, even when aided by a discharge of other pre-petition debts.

*Lorenz*, 337 B.R. at 430.

This Court need not belabor the debate. Many courts in this Circuit have published thorough and thoughtful opinions rejecting the *Brunner* test and adopting the totality of the circumstances approach as more prudent. *See, e.g. Stevenson*, 463 B.R. 586; *Hicks*, 331 B.R. 18; *Kopf v. U.S. Dept. of Educ. (In re Kopf)*, 245 B.R. 731 (Bankr. D. Me. 2000). This Court agrees with the analyses set forth in those cases and concludes that the *Brunner* test imposes requirements of proof that are not supported by the statutory text – i.e., "that the *Brunner* test 'test[s] too much.'" *Hicks*, 331 B.R. at 18 (quoting *Kopf*, 245 B.R. at 741). "The totality of the circumstances test allows the Court to consider the facts and circumstances unique to each case and to measure the impact of those facts and circumstances on the Debtor's ability to pay now and in the future," *Taratuska*, 2010 WL 583952 at *6, and this Court expressly adopts the totality of the circumstances analysis to determine whether excepting a student loan from discharge will result in an undue hardship for a particular debtor and that debtor's dependents.

---

[5] *See, e.g., Bronsdon v. Educ. Credit Mgmt. Corp. (In re Bronsdon)*, 435 B.R. 791 (B.A.P. 1st Cir. 2010); *Taratuska v. The Educ. Res. Inst. Inc. (In re Taratuska)*, 2010 WL 583952 (Bankr. D. Mass. Feb. 12, 2010) (Bailey, J.); *Gharavi v. U.S. Dep't of Educ.*, 335 B.R. 492 (Bankr. D. Mass. 2006) (Hillman, J.); *Hicks v. Educ. Credit Mgmt. Corp. (In re Hicks)*, 331 B.R. 18 (Bankr. D. Mass. 2005) (Boroff, J.); *Nash v. Conn. Student Loan Found. (In re Nash)*, No. 02-1466, Slip op. (Bankr. D. Mass. June 18, 2004) (Feeney, J.), aff'd, 330 B.R. 323, 327 (D. Mass. 2005) (O'Toole, J.); *Dolan v. Am. Student Assistance (In re Dolan)*, 256 B.R. 230 (Bankr. D. Mass. 2000) (Rosenthal, J.).

Here, based on the Debtor's testimony and the documentary evidence, the Court finds that the Debtor is an intelligent, well-educated woman who, regardless of whether she is able to substantially increase her income, has reached a level of consistency in her current employment endeavors. She suffers from several medical conditions, but both her testimony and the documentary evidence indicate that she has been receiving care to successfully alleviate, improve, or regulate those conditions. However, the Court will not embark on a detailed of analysis of whether any increase in income would ever reach the level needed to make monthly payments on her remaining student loans. Rather, the outcome in this case turns on a separate, and dispositive, issue: the existence of substantial equity in the Debtor's Property that can be used to pay these student loans in full.

In her Schedule A, the Debtor listed the value of the Property as $165,000 on the Petition Date (August 2014). In 2016, as her daughter was entering college, the Debtor completed a FAFSA form indicating that she had "Net Worth of Current Investments" in the amount of $125,000. When questioned at trial, the Debtor testified that she did not have $125,000 in investments; rather, she believed the $125,000 represented her estimate of the value of Property, which she calculated by subtracting her estimate of the cost of needed repairs from a Zillow.com value of $228,000. When questioned later, however, the Debtor admitted that $125,000 value entered on the 2016 FAFSA form may actually have represented her estimate of the *equity* in the Property after deducting the cost of repairs and the outstanding amount of the mortgage.

The Court finds it most reasonable to conclude that, at the time she completed the 2016 FAFSA form, the Debtor believed she had at least $125,000 in *equity* in the Property, and not that she had reduced her opinion of the fair market value by $40,000 (from $165,000 to $125,000) between the 2014 Petition Date and the completion of the 2016 FAFSA. The Debtor testified at

10

length regarding the damage to the Property sustained from storms between 2009 and 2014, and relied on that damage in reducing her estimate of its value. As of the Petition Date, that damage had already occurred, and the Court finds that, absent any other documentary evidence, the originally-scheduled value ($165,000) was the Debtor's estimated value of the Property *after* deducting estimated repair costs. Thus, on the Petition Date, when the mortgage balance was approximately $59,000 (and excluding the judicial lien that was later avoided) the Debtor estimated there to be $106,000 of equity in the Property.

Approximately 2 years later, after deducting her estimate of home repair costs from $228,000, the Debtor believed that the equity had appreciated to $125,000. The Debtor did not indicate through testimony or documentary evidence that that amount had decreased a year later, at the time of trial. Accordingly, based on the Debtor's own evidence and testimony, given that the student loans at issue here total approximately $110,000, the Court finds that the Debtor has equity in the Property more than sufficient to pay the total of the Defendant's loans in full.

The mere existence of *some* equity in an asset does not always result in the denial of a debtor's request that a student loan be discharged for undue hardship under § 523(a)(8). For instance, if a debtor has no excess income above that required to maintain a minimal standard of living, requiring a debtor to refinance or sell an asset that will not generate sufficient funds to pay off the debt in full may result in the debtor exchanging a student loan debt they cannot afford for an increased mortgage debt they cannot afford. Or it may leave the debtor with reduced student loans that they still cannot afford. *See, e.g.*, *Greenwood v. Educ. Credit Mgmt. Corp. (In re Greenwood)*, 349 B.R. 795, 802 (Bankr. D. Az. 2006) (student loans discharged despite equity in home where amount of equity that could be refinanced would be insufficient to pay student loan off in full and debtors had no excess income with which to make an increased mortgage payment);

11

*Lieberman v. Educ. Credit Mgmt. Corp. (In re Lieberman)*, 2004 WL 555245, *5 (Bankr. D. Minn. 2004) (where proceeds from refinancing of home loan could not pay off student loan in full, student loans were discharged as the debtors had no surplus income with which to pay even a reduced balance).

However, in cases where a debtor has access to equity in an asset that could satisfy the student loan in full, courts have held that payment of the student loan does not present an undue hardship. *See, e.g.*, *Race v. Educ. Credit Mgmt. Corp. (In re Race)*, 303 B.R. 616, 625 (Bankr. D. Minn. 2004) (court considered existence of home equity that could satisfy student loans in full if property was sold in ruling that the loans would not be discharged); *Ammirati v. Nellie Mae, Inc. (In re Ammirati)*, 187 B.R. 902 (D.S.C. 1995), *aff'd* 85 F.3d 615 (4th Cir. 1996) (upholding bankruptcy court's partial discharge of student loan and noting with approval that the remaining balance was expected to be paid in full from equity realized in sale of debtor's home).[6]

Given the large amount of equity in the Debtor's Property, the burden was on the Debtor to present some evidence that (1) this particular home is necessary for the Debtor to maintain a minimal standard of living and (2) no alternative housing is available for a monthly rental payment commensurate with her current mortgage payment. *See Miller v. Sallie Mae, Inc. (In re Miller)*, 409 B.R. 299, 321 (Bankr. E.D. Pa. 2009). With regard to the income the Debtor receives from Airbnb rentals, an analysis of the Debtor's own evidence indicates that relocation to an affordable rental unit and the resultant alleviation of the real estate tax obligation will more than offset the

---

[6] This Court agrees with others that have concluded that, in the context of § 523(a)(8), "[t]he exempt character of an asset does not necessarily preempt its relevance to a hardship evaluation." *Armesto v. New York State Higher Educ. Servs. Corp. (In re Armesto)*, 298 B.R. 45, 48 (Bankr. W.D.N.Y. 2003). While the equity in the Debtor's Property is protected from attachment by creditors to satisfy their debts by virtue of the Debtor's homestead exemption, "the debtor's access to that exempt asset may nonetheless allow payment without any undue hardship to the debtor." *Id.*

12

loss of rental income.[7]

This Court does not, and cannot, announce a *per se* rule regarding the impact of a debtor's access to equity in an asset on a student loan dischargeability action, regardless of whether the equity is sufficient to pay off the loan in full. Instead, each case must be analyzed on its own unique set of facts. *See Armesto*, 298 B.R. at 48. Here, because the Court finds that the equity in the Property is sufficient to pay the student loans owed to the Defendants in full, and because the Court finds that the liquidation of that equity will not result in the Debtor being unable to maintain a minimal standard of living through the foreseeable future, the Court does not find that excepting the loans from discharge will result in an undue hardship for the Debtor or the Debtor's dependents within the meaning of § 523(a)(8). Nothing in this Court's opinion *requires* the Debtor to sell the Property to pay the student loans. Rather, the Court merely concludes that the existence of equity that could be liquidated to satisfy the debts negates any claim that payment of the loans imposes an undue hardship.

Accordingly, a judgment in favor of the Defendants and in conformity with this Memorandum shall enter forthwith.

DATED: May 2, 2018

By the Court,

_____
Elizabeth D. Katz
United States Bankruptcy Judge

---

[7] The last reported gross income from the Airbnb rentals totaled $1,633.83 for the period ending in August 2017. Given that the Debtor does not rent the Property during winter months, the Court finds this to be a reasonable estimate of the gross annual income for that year, or monthly income of $136.15. Subtracting the $65 per month in expenses related to the Airbnb rentals (indicated on the Debtor's amended Schedule I filed in September 2017), the Debtor's monthly net income from Airbnb approximates $71.15. Since she currently pays $270 per month for real estate taxes, even with the loss of the Airbnb rental income, the Debtor's net income would increase by about $200 per month if she sold the Property.